Good morning, Your Honors, and may it please the Court, Max Carter-Oberstone for the petitioner Lucero Xochihua-Jaimes. I'd like to reserve four minutes. How do you say the first one? Her first name is Lucero, and her last name is hyphenated. Lucero. Lucero. Lucero. I can attest from personal experience that hyphenated last names can sometimes be difficult to pronounce. Right, but it shouldn't be hyphenated, right? It should really just be Lucero. Her first name, yes, is Lucero, correct, and her last name is hyphenated. So why is it hyphenated at all? Start the clock all over again, by the way. I'm sorry, her last name is hyphenated. Her first name is not hyphenated, Your Honor, correct. All right. We'll call her Jaimes. We'll call her petitioner. Why not? That's easy. That's perfect. Ms. Xochihua-Jaimes, the petitioner, has a target on her back. Not only has she endured a lifetime of physical abuse, sexual assault, and anti-gay discrimination, but she's also the target of a credible death threat by one of Mexico's most prominent transnational drug cartels. During her last visit to Mexico, a leader of the Los Setas cartel was waiting for her at the border. That same day, Mexican police watched and laughed as that leader of the cartel assaulted her, pointed a gun to her head, and told her that she would be killed if she ever left the abusive relationship that she was entrapped in. Nine years later, when she gained the courage to leave her abuser and land him in jail, two individuals arrived to her home in the United States, assaulted her, and threatened her at gunpoint that she would be murdered if she ever returned to Mexico again. These facts show that Ms. Xochihua-Jaimes is more likely than not to be tortured if returned to Mexico against her will, and the documentary and evidence in this case further bolsters that point. Currently, gang violence in Mexico is rampant, with 98 percent of cartel-related crimes going unpunished. Government officials, particularly at the state and local level, are actively aiding and abetting the cartels carry out their crimes, and Los Setas, which our State Department has labeled a transnational criminal enterprise, has been especially prolific in its crimes in all regions of Mexico with the help of government agents. The unrebutted evidence in this case, therefore, makes clear that there is nothing that would stop Los Setas from making good on its threat to murder Ms. Xochihua-Jaimes if she were returned to Mexico. And that is just one circumstance of many that makes this case particularly more compelling than many of this Court's prior cases, where it has reversed the agency and granted the applicant full relief under the convention. Counsel, this is a very compelling story. It really is, and I'm troubled by it. To me, there are two legal issues that we need to wrestle with here. One is basically the officials, the acquiescence, and I need to know whether the concept of more likely than not, how that interacts with a rogue official under Barajas Romero. And then secondly, the relocation idea. What does the agency need to show with regard to relocation? As you very well know, I'm sure even though you gentlemen are graciously acting as pro bono counsel here, we get hundreds, hundreds of cases where people are the victims of regular crime as a result of cartels in Mexico. But this one has unusual facts, and so I would really appreciate your help. I have some of the same issues, perhaps. Can you address the how we, if you will, deal with more likely than not standard versus the rogue official in Barajas Romero, and what exactly the agency needed to show in order to comply with the regulations on relocation here? Would you do that for us, please? Certainly, Your Honor. So first, as to the official acquiescence issue, and Your Honor mentioned the rogue official discussion in Barajas Romero. So under Barajas Romero and Parada, those cases both make clear that there is no rogue official exception to official acquiescence, that the actions, official acquiescence doesn't necessarily implicate the action, the conduct of high-ranking officials or nationwide policies. Now, I think there are three cases of this Court that really put into relief why the record compels conclusion that first is Bringas Rodriguez. In that case, the Court found that the record compelled official acquiescence for two main reasons. First was country-conditioned evidence showing widespread violence and government acquiescence in that violence, and it's essentially the exact same evidence that's in the record in this case. The applicant in Bringas Rodriguez was also from Mexico, and in fact, also from the state of Veracruz, where Ms. Xochitl O'Hara hails from. But with respect, the whole country is filled with violence, but in this case, the facts that troubled me particularly was that the police were, in effect, laughing as she was being effectively tortured. Doesn't that meet the standard? And if it does, what should we rely upon? Does that meet the standard, or more likely than not? That absolutely meets the standard, and that brings me to the second factor that the Court relied on in Bringas Rodriguez, which is in that case, the applicant testified that he had second-hand knowledge of acquiescence, that his friends had reported homophobic crimes to the police, and the police failed to act. Here, the evidence is even stronger. Ms. Xochitl O'Hara is testifying to first-hand knowledge of police watching her being beaten and having a gun pointed at her head and failing to intervene. And her testimony was not contradicted, is that correct? That's correct. Did the I.J. indicate that he or she credited the testimony, or was it just uncontroverted? The I.J. made a positive credibility finding in this case, and under many of this Court's cases, including Ornella Chavez and others, once the positive credibility finding is made and is not rebutted by the BIA, her testimony is deemed to be true, as well as all reasonable inferences that could be drawn from it. I would also point to the Court on this exact issue to a second case, Avendano-Hernandez. At footnote 2 of Avendano-Hernandez, the Court says, where a local police officer witnesses a third party committing torture and does not intervene to help the victim, that constitutes official acquiescence per se. Those are exactly the facts of our case. And I should also just emphasize, we don't even need the applicant's personal testimony necessarily to prove out official acquiescence. In Bromfield, this Court found acquiescence on the basis of documentary evidence standing alone. There, the evidence showed widespread violence against gay and lesbian people in Jamaica. The applicant had never been tortured, never been threatened with torture, and this Court didn't hesitate to find official acquiescence in that case as a matter of law. And how do we find individual, a threat of individualized persecution against your client? Is it because the Losaites had threatened her with death if she left her boyfriend, Luna? I think that's absolutely right, Your Honor. I think the fact that she has been personally singled out for death by one of the country's most powerful transnational drug cartels is very strong evidence that she would be tortured and, in fact, murdered if returned to Mexico against her will. The fact that that threat was followed up on nine years later underscores the fact that Losaites has a long memory and intends to make good on its promise to murder her if she ever sets foot in the country again. There was also, if I recall, evidence that Luna basically bribed local officials to not interfere in his family domestic violence issues. Is that correct? That's correct, Your Honor. There was evidence in the record that he was able to bribe local officials to actually detain the mother of another mother of different children, that he was able to have her detained without any judicial process, without any probable cause for an arrest. Now, getting to Judge Smith's second question about relocation. So the agency's relocation analysis was insufficient for two reasons. One, it committed a legal error, and second, committed a legal error by applying the wrong standard and contravention of this court's holding in Maldonado that the applicant bears no burden to come forward with evidence as to internal relocation. And secondly, it failed to consider relevant evidence in the record on the question of relocation. And that had to do with Losaites having power throughout the country, right? That's absolutely right, Your Honor. The agency concluded that Losaites was parochial power confined to the state of Veracruz, but there's simply no evidence in the record to reach that conclusion. In fact, as we laid out in our brief, there's evidence in the record of Losaites committing crimes all throughout Mexico. And you're saying she's not safe anyplace in Mexico, period? That is exactly what the record shows, that there is no limit to where Losaites can carry out its crimes. And again, I would emphasize that our own State Department has labeled it a transnational enterprise, so presumably able to carry out its threats across Mexican borders as well. Certainly, there is no evidence in the record to support the BIA's conclusion that it's limited to Veracruz only. As we point out in the record, there's crimes that it's committed in the northern border towns, very far away from Veracruz, in Mexico City, and a number of other places. And I think that this court's opinion in Madrigal actually underscores the and went into hiding, Losaites was able to track him down there and attempt to murder him by drive-by shooting. Losaites was also able to track down where his parents lived and send threatening letters threatening to murder him to his parents' house. So I think both the record and this court's prior case law leaves little doubt that Losaites has nationwide powers. Do you believe that our existing case law adequately clarifies the two issues that I raised in this case, or do we need an opinion further delineating the test that must be met to satisfy both issues? I don't believe there is the need for a published opinion to clarify these issues. The official acquiescence issue has been addressed in case after case after case, where the BIA makes this exact same mistake, where it assumes that you have to show the actions of high-ranking officials or nationwide policies in order to demonstrate official acquiescence. So Your Honor already pointed out the rogue, there being no rogue official exception. The court just addressed that in 2018 in Parada, but that was a follow-up to Barajas-Romero, where it also addressed that. And this issue was also touched upon in Bringas-Rodriguez, in Avendano-Hernandez, in Aguilar-Ramos, and many, many other cases. So I don't think there's a need for a published opinion on that issue. I would like to just quickly focus on what the appropriate remedy is in this case. The court should not remand this case back to the agency for any further consideration. The first thing to note is that the government hasn't requested a remand here, and in fact, despite the issue of what the appropriate remedy is being clearly raised in the opening brief, the government opted not to respond. Secondly, there's nothing extraordinary about granting full relief in a situation like this, where all of the facts and law have been thoroughly considered by the agency. This court has done that, exactly that, in Avendano-Hernandez, in Edu, in Haley, in Hosseini, in Coop. And finally, this court just recently in Parada said that continual or unnecessary remands back to the agency are disfavored, where they would unduly prolong the litigation. So if you were on the panel, what would your decision state? What would be the resolution? I think that the resolution of the case would say, the record here compels the conclusion that Mr. Chibuhaimez is more likely than not to be tortured if returned to Mexico. We remand to the agency to grant deferral of removal under the Convention Against Torture. So a remand, but just a mechanical administrative remand? Exactly, Your Honor. If I could reserve the remainder of my time for rebuttal.  Thank you. May it please the Court, Rebecca Hoffert-Phillips on behalf of the United States Attorney General. I have to correct some factual assertions right off the bat. Bringa Stibb was not a CAT acquiescence case, number one. That only addressed asylum, and it found past persecution and remanded for further analysis. Which case? Bringa Rodriguez. Bringa Rodriguez. I'm sorry. My opposing counsel— Sorry. I wrote that decision, and I know it involved official governmental acquiescence. It found past— It's conduct, persecution that the government was unable or unwilling to control. It was a big section of that opinion. Unable and unwilling is the standard for asylum and withholding. It is not the standard for CAT acquiescence. But they're analogous. Your Honor, with all due respect, the government asserts that there are key differences between them, and that was pointed out by the Garcian-Millian case in particular in terms of when a government, you know, has taken measures but is ultimately unsuccessful, that that is distinguishable as not acquiescence just because it can't produce the results in terms of government effectiveness in Garcian-Millian. In the Bringas Rodriguez case, the underlying decision before the court took it in bank did make a CAT decision actually in the government's favor. And then on in bank, Your Honor, you found—you remanded for the CAT analysis to consider the HIV status of the petitioner in that case. There was no actually any CAT finding on the merits in that case, Your Honor. And so our brief points this out on page 26 in terms of it being an asylum and withholding case. So I just want to start with that. Number two— I thought that would be a lesson to you. Right. But the point—the point—well, Ms. Phillips has been in front of us several times now. She's very good. Thank you, Your Honor. So I'm not afraid to challenge her. But in terms of what the agency did here, though, what they were saying is, oh, the country condition report say they're making all these efforts. But the fact of the matter is—and this is where I'm saying it's analogous—is the facts on the ground were that that wasn't happening. Yes, Your Honor. And to that extent, the government will agree that we need to look at the facts on the ground absolutely in terms of, you know, what's actually going on. In other words, just because you legalize gay marriage, what does that mean in terms of how people are being treated? And I understand that. In this case, which you have only with respect to her homosexuality status—let's deal with that. There's actually two parts to this CAT claim. There's the Zetas claim and there's the lesbian status claim. I'd like to address both. First, with respect to her homosexuality, there's no evidence in this record other than generalized evidence with respect to the government has offered protections to the community in terms of the LGBT community. And what the record shows in this case is that, yes, there can be potential harm, potential discriminatory actions, most notably towards trans women, not lesbians. I want to make that clear. This record does indicate that there is some official corruption with respect to transgender individuals. When I look— I think her strongest claim has to do with the Zeta cartel. Yes, Your Honor. I would agree with that because there was only generalized evidence and no one knew that she was a lesbian. I'm not saying she needs to hide who she is at all. But the only evidence in this record is that her family knew that she was a lesbian and was harming her and no one else would be looking to harm her because of being a lesbian. So I absolutely agree with Your Honor. So moving on to the Zetas part of her claim, there's several aspects showing both with respect to the lack of a likelihood of torture and with respect to the lack of acquiescence. And that brings me to my second factual correction. Your Honor, there is nothing in this record that says the police watched her be tortured and laughed. I have to direct this Court's attention to page 122 of the record. Her statement is pretty ambiguous in terms of what happened. What she says is—she's referring to the cousin at this point—he would just point a gun to my head and they were all just laughing. And she had been previously talking about his relatives. That they were all just laughing actually doesn't apply to any police at that point. Okay? And in 2005, he beat me up so bad and it was—and then it says indiscernible, and I believe it's probably referring to the location. The police would drive by, but—and then on to page 123—but they wouldn't give me any help, period. They were just laughing at me. So was the they were just laughing at me—if you look at the rest of that paragraph, she's a little bit repetitive in terms of her speaking. Was it they—who is the they there? That's the key question. Now, Your Honor, I'm going to go with this both ways. Okay? Let's assume that it was the police, but the government isn't even going to take that assumption. Okay? Because I don't believe she actually said that the police were laughing at her. The police drove by. She doesn't say that they saw her being harmed. But you would agree that it is a reasonable construction of what you read that the police were laughing at her. It could be, Your Honor. So I'm going to go with it both ways. Okay? So on the one hand, maybe they didn't even actually see her being harmed at all and they weren't laughing at her. But let's say they did. Let's say that they—that that is what happened. What the board found, and specifically recognized this in a footnote in its decision, was that, number one, this is the closest and the only piece of evidence that she has tying anybody in the government at all to any of the harm that she experienced. Period. And this was one event— Wait a minute. Mm-hmm? I thought that there was evidence that Luna, who was the primary abuser for a long time, was able to get—I forget, was it her mother or somebody else's mother and maybe in somebody else's jail to allegedly bribe the police so as not to interfere. Can we not assume that since she was being abused by the same guy and he had the relationship with the police, that there's good reason to believe that they are corruptible and with respect to his family and personal matters, they won't interfere? Well, Your Honor, there isn't really much explanation of all of how he was able to do that. And first of all, he hasn't been in Mexico. He has been in the United States now. So to the extent that he was able to maneuver anything, that was—I mean, that was ages ago, number one. That was decades ago because he's been in the United States. And in fact— But with respect— Yes? Don't we have lots of evidence? I personally have sat on a number of these cases where you have powerful people that live in the United States that are part of the cartel that have a lot of money and they order people murdered and whatever all throughout Mexico and elsewhere. What evidence should we look to that suggests that just because Luna was in the United States, that because he was part of Los Detas, that he couldn't corrupt and direct some local police department? There's no indication that he had that kind of relationship with the organization as a whole or with the government as a whole anywhere. What he has is a couple— What about putting these relatives in jail with a bribe to the local police? Your Honor, there was— That's not controverted, is it? That his ex-partner from way back in the day was—that she claims that that's what he did? It's uncontroverted, right? I mean, sure, to the extent that she believes that that's what happened and it was decades ago and he was in Mexico at that time and on the ground there, not that he was able to get all these third parties involved to maneuver that. So to the extent that he's here and that was decades ago, I mean, it's pretty irrelevant at this point. And it also is not her in particular— Well, then it may be attenuated, but it's not irrelevant. Okay. So, Your Honor, we would point out that his relationship to the Zetas has always been speculative at best because what he has is a couple relatives that were in the Zetas and that they had sort of these personal—you know, they were personally interested in making sure that he, as their relative, was not wronged by this woman, that it wasn't a Zetas thing to go after her. It was his personal relatives that were involved with her. So there's nothing linking their trying to look out for their family relative with the whole greater organization of Zetas. And, in fact, when she went with them to Baja, California, when she returned in 2005, the Zetas are actually primarily in Veracruz. And, Your Honor, you were saying, where is the evidence showing this and they're everywhere. I would ask the Court to look at page 350 of the record talking about Veracruz in particular with the Zetas and this matter. Well, they are there, but they're elsewhere also. And I think in the record—I don't know right off the top of my head where—but there's evidence that they are powerful throughout Mexico, not just in Veracruz. Well, Your Honor— Do you dispute that? I mean, a lot of the cartels, you know—she didn't point to any evidence saying that they would look for her anywhere as a Zetas organization as opposed to his particular relatives acting in their sort of personal capacity. Again, with respect—again, I'm the judge, not the advocate, so I don't have the record right in front of me, but I'm pretty sure that the record indicates that there is evidence that the Zetas are powerful throughout Mexico, not just in Veracruz. Do you dispute that? I would say that they were focused—the record, the IJ found that they were focused in the surrounding areas of Veracruz. Mexico is an extremely large country, and so— Been there? Yeah. So, in other words—and I want to get to the relocation finding in a minute, but in other words, in terms of what is the likelihood that the Zetas as a drug organization are looking for her as the Zetas, there's no evidence indicating that. Her just speculation based on his couple of relatives who are in the Zetas, all of a sudden— She certainly says they are. And she's credible, but she's speculative, and I have to— But if she says it, and nobody contradicts it, and the IJ found her credible, don't we have to take that into account? Again, is it attenuated? That's a different issue, but we have to take it as true, right? Your Honor, you have to accept that she truly subjectively feels a certain way. But subjective isn't the same thing as objective reasonableness, and it's not the same thing as proving something as a fact just because we believe that she believes that. And I have to really point that out here, because nobody's saying that she's not credible in terms of this is what she thinks, but in terms of what the record supports and what the objective evidence suggests, the Zetas were not looking for her as a drug organization. Well, I'm not sure I agree with you. When we hear these immigration cases, we hear all kinds of stories that some of them are exactly the same and probably are manufactured. But this one, you have a terrible story of personal violence and rape and abuse, an unbelievable level of abuse. She tells us in the record what happened. She talks about the Zetas. She talks about the role of the Zetas with Luna and perhaps others. She fears the Zetas. They came to her in the United States and told her if she ever came back, she'd be murdered. Now, you may say, she was just speculating. But she says that, and nobody contradicts it, and at least in the immigration context, unlike, say, a criminal trial, we have to take this as true. And if we take it as true, I don't see where the government's position on this really holds a lot of water. Your Honor, a few things. The Zetas didn't come to the United States to threaten her. What happened was Luna's children from a prior relationship came to her, okay? There was nothing saying that everybody related to Luna's in the Zetas. I didn't see how his children from a prior relationship who had been living in the United States in California. And didn't they say that if she came to Mexico that the Zetas would kill her? They threatened that she would be killed. But they're here in the U.S. They're his children from a prior relationship. And, you know, they're looking out for their dad because they think that she put him in jail. He was sexually abusing her oldest child. And so she put him in jail for that. And they were pretty upset about it. And they came and found her. This is all on a very personal level. This is not some big Zetas are coming after me and the Zetas are now involved as this organization. I have to emphasize that. These are individual relatives who were mad that their relative was being mistreated. Records state that. Yeah, the record states that it was his children. Oh, I understand that. But does the record state that they were mad because she put him in jail? Yes, Your Honor. They were upset that they... I'm sorry. I'll have to get you that really quickly. No, you can give it to us after. Okay. Yeah, I'm sorry. I know that they didn't want her putting away their father. Okay? But he sexually abused her daughter. So she pretty much had no choice. Your Honor, it's a very sad story. But I do, you know, we have a legal standard to meet. And this unfortunately describes so many people in terms of general fears of criminal violence. See, I think that's what Judge Smith is saying. This is not a story that generally describes so many people with generalized fear. This woman's been persecuted by the Zetas. Now, they may or may not be also related to her through her ex-husband. But they're also the Zetas. Your Honor, that's where it's unclear to what extent how many exactly. We know his cousin was significantly involved in the Zetas, maybe an uncle too. I'm not convinced that he has this role in the Zetas that she has made it out to be based on this record. I don't know your experiences, but in a lot of the criminal cases we see about how gangs operate, the gangs are a family, right? And they could be related or not related, but still a family and they do each other's bidding. That's true, Your Honor. But to the extent that this is gangs, and I also wanted to mention with the acquiescence part, I mean, there was only, as I mentioned, this one attenuated incident. To use your words, Your Honor, it's from a very long 2005, a single incident that's unclear. But even if the police at that point, and the government's not disputing that a local official could be the one to acquiesce, that is not what we're disputing. What we're saying is you have to show more likely than not going forward based on what, and this is in the Board's footnote, a vague description of a single incident from 2005 does not show government acquiescence more likely than not going forward. Your Honor, I see that my time has run out, but I'm happy to answer any further questions that the Court may have. Okay. Thank you very much, Mr. Phillips. If I might, Your Honor, is address a couple of things that my friend on the other side just made. So first, my friend on the other side said that the critical issue relating to the death threat in Mexico where the police watched and failed to intervene, she said that the key issue was who was laughing, whether it was the cousin and the Zetas laughing or the police. That is completely immaterial to the analysis. What matters is that police witnessed the assault and the death threat at gunpoint and failed to intervene. Whether they happened to be laughing while they failed to carry out their obligation to help Mr. Chihuahamas or not just simply doesn't matter. Secondly, the follow-up death threat in 2014, there is evidence in the record suggesting that Luna's daughter, who was one of the people who carried out that threat, is a member of Los Zetas at AR-665-666. Finally, I think just taking a step back from the facts of this case, the facts of this case are far more compelling than prior cases where this In Haley, for example, this court reversed the agency and granted full relief on the basis of a single threat to arrest the applicant. Here, Ms. Chihuahamas has two, not one but two threats, and not merely to arrest her but to murder her. In Hosseini, this court granted full relief under the Convention Against Torture on the basis of documentary evidence alone. In that case, unlike here, the applicant was deemed not to be credible because he actually committed immigration fraud at nearly every stage of the proceeding. He had never been tortured. He had never been threatened with torture in the past, and yet this court still granted full relief. So if the facts of Haley and Hosseini compel the conclusion that the applicant deserved relief under the Convention Against Torture, there is no reason to reach a different result here, and certainly the government has not furnished this court with any such reason. The government does not respond to Haley, does not respond to Hosseini in its briefs, and has provided this court with no sound basis to depart from those cases or any of the other cases discussed in the opening brief where full relief was granted, such as Edu, such as Coop, such as Avendano-Hernandez. In Parada, this court recently noted that unnecessary remands back to the agency are disfavored because they unduly prolong the litigation and potentially set up a situation where the applicant might never get resolution because the case is constantly ping-ponging back and forth between this court and the agency. That consideration is particularly acute here, where the applicant is detained and has been detained in DHS custody for three years and is desperately trying to be reunited with her six American children. She's demonstrated entitlement to relief. She deserves the opportunity to live freely in the only country that she can call home. All right. Thank you very much, Counsel. I want to recognize Orrick Harrington and Sutcliffe and Mr. Carter Oberstein and I believe Mr. Goldman for their pro bono representation. Thank you.
judges: Siler, Wardlaw, M. Smith